2026 IL App (1st) 242188-U

FIFTH DIVISION
August 14, 2026

No. 1-24-2188

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 0610201 |
| | ) | |
| KENNETH TATE, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Wilson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for attempted first degree murder, aggravated criminal sexual assault, and aggravated battery are affirmed where the evidence was sufficient to prove him guilty beyond a reasonable doubt.

¶ 2    Following a jury trial, defendant Kenneth Tate was found guilty of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)), aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West 2016)), and aggravated battery (720 ILCS 5/12-3.05(a)(5) (West 2016)). He was sentenced to a total of 50 years in prison: 20 years for attempted murder, 30 years for aggravated criminal sexual assault to be served consecutively to the sentence for attempted murder,

and 5 years for aggravated battery to be served concurrently with the sentence for attempted murder. On direct appeal from these convictions, Mr. Tate argues that (1) the State failed to establish that he had the specific intent to kill needed to support his attempted murder conviction, (2) that the evidence was insufficient to sustain any of his convictions, and (3) the State misstated the evidence during closing arguments. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On June 26, 2020, Mr. Tate was charged by indictment with numerous offenses stemming from the September 24, 2017, assault of J.G.  According to the State, Mr. Tate forcibly attacked J.G. after approaching her on a downtown Chicago street, strangled her, compelled her to perform oral sex, and sexually assaulted her while threatening to kill her. Before trial, the State elected to proceed on one count of attempted first degree murder, two counts of aggravated criminal sexual assault, and one count of aggravated battery.

¶ 5                                    A. Trial

¶ 6                                    1. J.G.

¶ 7     J.G. testified that on September 23, 2017, she went out with friends to celebrate her twenty-seventh birthday. After dinner, the group stopped at several different bars. Shortly after 2:00 a.m. on September 24, 2017, J.G. decided to return home. She left her friends, exited the bar alone, and used her phone to request a Lyft ride. Because the fare reflected surge pricing where she was located, she began walking towards a less crowded area.

¶ 8     As she walked near 320 North Clark Street, someone called out from behind her. She turned and saw Mr. Tate, whom she identified in court, standing a few feet away. According to J.G., Mr. Tate initially spoke in a friendly manner and suggested that they knew each other. She did not recognize him, and after a brief exchange she sensed his demeanor change. Feeling uncomfortable, she stepped backward. Mr. Tate immediately lunged toward her, grabbed her by the hair and neck,

2

and announced, "I'm going to have sex with you whether you like it or not." When she begged him to leave her alone, he responded by telling her to "shut the f*** up, b***h."

¶ 9    Mr. Tate forced J.G. away from the sidewalk toward a park-like area adjacent to a commercial building, maintaining his grip on her neck and hair. He shoved her onto her knees on uneven paver stones. As she continued pleading for him to stop, Mr. Tate warned, "The more you scream, the more you're going to die." He then placed both hands around her neck and squeezed with what J.G. described as "great force." She testified that she could neither breathe nor speak and believed she was going to die. Although she could not estimate exactly how long the strangulation lasted, she described it as feeling "like forever."

¶ 10    Mr. Tate eventually released one hand from her neck while keeping the other in place. Standing directly in front of her, he exposed his penis and told her to perform oral sex on him. When J.G. attempted to stand, Mr. Tate punched her in the right side of her face near her eye, making her disoriented. Mr. Tate then forced his penis into her mouth while again placing both hands around her neck and thrusting repeatedly. J.G. testified that she struggled to breathe throughout the assault.

¶ 11    J.G. tried to stand up again and "thought she was going to escape," but Mr. Tate grabbed her by the shoulders, causing her right foot to twist and resulting in what she would later learn was a fracture. Mr. Tate struck her in the face a second time, causing her to fall backward onto the ground. She testified that she began drifting in and out of consciousness.

¶ 12    While she was on the ground, Mr. Tate straddled her body, pulled down her pants, moved her underwear aside, and vaginally penetrated her with his penis. J.G. testified that the assault was especially painful because she was menstruating and still had a tampon inserted. She repeatedly tried to resist but was unable to overcome Mr. Tate because she was fading in and out of consciousness. J.G. testified that at no point during the attack was Mr. Tate wearing a condom.

¶ 13    When J.G. regained consciousness, Mr. Tate had fled. Despite significant pain in her right foot, she ran toward the street seeking assistance. Several vehicles passed without stopping until someone eventually called 911 for her.

¶ 14    When police officers arrived, J.G. told them about the attack. She testified that she was frightened, upset, and traumatized while describing the attack to the officers. She was then taken to Northwestern Memorial Hospital (Northwestern) at approximately 4:30 a.m., where she underwent a sexual assault examination and provided a statement to Detective Myles from the Chicago Police Department (CPD).

¶ 15    At the hospital, medical personnel photographed her injuries. J.G. testified that her injuries included, and the photographs depicted, scratches and abrasions on her neck, bruising and swelling around her right eye and face, and bruising to her right foot. The photos also depicted a scar that J.G. explained was from a prior surgery. J.G. took additional pictures at home in the week following the attack, which she testified showed the swelling and bruising to her foot and knees, as well as the orthopedic boot she was required to wear during her recovery.

¶ 16    More than two years later, on February 16, 2020, J.G. met with CPD Detective Joseph Montanaro to view a photographic lineup. After reviewing and signing the advisory form, she immediately identified Mr. Tate as the person who assaulted her.

¶ 17    During cross-examination, defense counsel questioned J.G. about differences between her trial testimony and some of her earlier statements. J.G. acknowledged telling officers shortly after the assault that she believed she had seen her attacker before, but she explained that she was confused because Mr. Tate had suggested they knew each other when he approached her and she realized only later that she had never met him before. J.G. could not recall telling responding officers or emergency medical personnel that she had lost consciousness or that Mr. Tate had punched her multiple times in the head.

4

¶ 18    On redirect examination, J.G. testified that, right after the attack, she was in a heightened emotional state and also felt like the officers questioned her rapidly and repeatedly interrupted her responses while she attempted to recount what had occurred.

¶ 19                                2. Additional Testimony

¶ 20    Following J.G.'s testimony, the State presented testimony from the first responders, medical personnel, law enforcement officers, and forensic experts who examined J.G., documented her injuries, collected evidence, and analyzed the physical evidence recovered during the investigation.

¶ 21    Jeremy McCool, a paramedic, testified that he and his partner responded to a report of a sexual assault near 315 North Clark Street around 3:55 a.m. on September 24, 2017. When they arrived, J.G. was seated on a curb crying and visibly distraught. She said that she had been sexually assaulted approximately an hour earlier. CPD officers arrived shortly thereafter and interviewed her for approximately twenty minutes before she was transported to Northwestern. Mr. McCool testified that he did not observe obvious physical injuries at the scene and did not recall J.G. complaining of specific injuries while in his care. Mr. McCool testified that J.G. was too distraught to sign portions of the ambulance paperwork and required a nurse to complete the documentation for her.

¶ 22    Paige McAdams, an emergency department nurse qualified as an expert in nursing, testified that she treated J.G. shortly after her arrival at Northwestern. Ms. McAdams documented abrasions and petechiae on J.G.'s neck, bruising and swelling to her right foot and buttocks, and a limp while walking. Ms. McAdams explained that petechiae are burst capillaries under the skin, typically caused by some sort of pressure or trauma. As part of the sexual assault examination, Ms. McAdams obtained a detailed history of the assault from J.G., collected swabs from J.G.'s mouth, vagina, and anus, and secured J.G.'s clothing and tampon as evidence. Ms. McAdams testified to

the account that J.G. provided, which was consistent with J.G.'s trial testimony and, according to Ms. McAdams, consistent with the examination's physical findings. J.G. described her assailant as a Black male, approximately five feet eight or five feet nine inches tall, slim, clean shaven, and in his mid-to-late twenties.

¶ 23    On cross-examination, Ms. McAdams acknowledged that portions of her written notes did not indicate that J.G. reported losing consciousness or being punched repeatedly in the head. She did recall that, while completing the sexual assault examination, J.G. consistently reported that Mr. Tate repeatedly punched her when she attempted to escape.

¶ 24    Dr. Nishant Parekh, a radiologist at Northwestern, testified that he reviewed x-rays taken of J.G.'s right foot and ankle, and concluded that J.G. sustained an acute fracture at the base of the fifth metatarsal of her right foot.

¶ 25    Dr. Philip Jackson, an emergency medicine physician at Northwestern, testified that he treated J.G. shortly after her arrival at the hospital and performed both the physical examination and the physician's portion of the sexual assault examination. Dr. Jackson testified to the account of the assault that J.G. provided, which was consistent with her testimony. J.G. specifically reported that Mr. Tate punched her in the face and strangled her by compressing her neck with both hands.  During his physical examination, Dr. Jackson documented linear abrasions across the front and sides of J.G.'s neck, bruising to her left knee, bruising and swelling to her right foot, and tenderness in the areas where she reported being assaulted. He explained that abrasions are superficial breaks in the skin caused by friction or shearing force. Dr. Jackson observed blood pooling within J.G.'s vagina but could not determine whether the blood resulted from trauma or her menstrual cycle. According to Dr. Jackson, J.G.'s injuries were consistent with the history she provided, with being strangled, and with being sexually assaulted. He explained that manual strangulation can be fatal because compression of the airway or blood vessels supplying the brain

can deprive a victim of oxygen. Depending upon the amount of force applied and the individual's health, unconsciousness can occur within seconds to approximately one minute, and death can result after only several minutes of sustained pressure.

¶ 26    On cross-examination, Dr. Jackson acknowledged that he did not observe bruising to J.G.'s head, hemorrhaging in her eyes, significant trauma to her mouth, or obvious injuries to her external or internal genitalia. He also testified that J.G. did not report losing consciousness during his examination, and he did not document bruising or swelling suggesting an internal neck injury. Dr. Jackson explained that neither strangulation nor sexual assault necessarily produces visible physical injuries. He explained that in his experience, many strangulation victims exhibit little or no outward injury, and sexual assault victims frequently present without genital trauma. He further testified that J.G.'s menstrual bleeding could have obscured evidence of internal injury.

¶ 27    Detective Joseph Montanaro testified that on February 16, 2020, he served as the independent administrator of the photographic lineup presented to J.G. After reviewing the required advisory form and explaining that the suspect might or might not be present, Detective Montanaro presented the photo array. J.G. selected Mr. Tate's photograph and wrote that he was the person who assaulted her. On cross-examination, Detective Montanaro acknowledged that the lineup procedure was not audio or video recorded. He explained that he believed J.G. did not wish to be recorded, although she had indicated otherwise on one portion of the advisory form, which he stated he simply overlooked at the time.

¶ 28                                3. DNA Evidence and Stipulations

¶ 29    The parties also presented stipulations to the testimony of multiple forensic scientists who examined the biological evidence. One forensic scientist would testify that male DNA was found on the swabs from J.G.'s mouth, but the resulting profile reflected a mixed sample containing predominantly J.G.'s DNA, and no conclusions could be drawn from this incomplete profile.

Another forensic scientist obtained a partial Y-chromosome profile from the oral swabs from which Mr. Tate could not be excluded as a possible contributor. Although the profile was limited, not uniquely identifying, and incapable of establishing when or how the DNA was deposited, she would testify that "it is at least 17 times more likely if Kenneth Tate or a paternal relative is the contributor." Semen collected from the sleeve of J.G.'s shirt matched Mr. Tate's DNA profile. According to the forensic scientist who analyzed that sample, the statistical frequency of the resulting DNA profile was approximately one in 86 nonillion unrelated individuals.

¶ 30                                        4. Mr. Tate

¶ 31     After the State rested and the court denied Mr. Tate's motion for a directed finding, Mr. Tate testified in his own defense. He stated that on the evening of September 23, 2017, he had been out with coworkers from the Shake Shack restaurant where he worked. Throughout the evening, the group visited several bars, including the Broken Shaker located inside the Acme Hotel. According to Mr. Tate, he left Broken Shaker shortly after 2:00 a.m. intending to continue visiting bars farther north. While walking near Grand Avenue and State Street, he encountered J.G., whom he believed he recognized from Shake Shack. Mr. Tate testified that J.G. initiated conversation, told him it was her birthday, and walked with him for several blocks while they talked.

¶ 32     Mr. Tate testified that they eventually entered a courtyard near Clark Street that differed from the location J.G. had identified during her testimony. Using photographs introduced by the defense, Mr. Tate identified what he claimed was the actual location of their interaction. He described the courtyard as an open public area containing benches, trees, planters, and landscaping, and testified that numerous pedestrians and vehicles were nearby throughout their conversation.

¶ 33     Mr. Tate estimated that they remained in the courtyard for approximately ten to twenty minutes. During that time, he asked J.G. whether she wanted to accompany him to another bar. Mr. Tate testified that she declined and as he prepared to leave, J.G. grabbed his arm, pulled him

back toward her, and asked whether she could accompany him to his apartment. Mr. Tate responded that he lived with roommates and could not bring her home.

¶ 34 According to Mr. Tate, J.G. then unexpectedly placed her hand inside his pants and began fondling his penis. Mr. Tate testified that she did so discreetly because they remained in a public place. He claimed that he initially froze before stepping backward and telling her goodnight. Mr. Tate denied ejaculating but acknowledged that "pre-cum" may have been deposited on J.G.'s hand or clothing, which he believed explained the DNA evidence recovered during the investigation. Mr. Tate testified that after leaving J.G. seated on a bench in the courtyard, he went back out before eventually requesting a Lyft home from East Lake Street at approximately 3:45 a.m.

¶ 35 Mr. Tate categorically denied assaulting J.G. He testified that he never placed his hands around her neck, struck her, threatened her, forced her to perform oral sex, engaged in vaginal intercourse with her, or attempted to kill her. He further testified that he did not observe any injuries to J.G. during their encounter and that she did not appear intoxicated or impaired. Mr. Tate testified that he had training in boxing and martial arts and knew how to inflict serious injury if he chose, but did not do so here.

¶ 36 During cross-examination, Mr. Tate acknowledged that he had been convicted of aggravated battery by strangulation in 2023. He admitted that the offense involved strangling a woman in 2019. The court had granted the State's pretrial motion seeking to admit this other crimes evidence. He also acknowledged that he could not recall many details about the evening of J.G.'s alleged assault, including what time he started the night out, how he traveled into downtown Chicago, the identities of the friends he was with, how many drinks he consumed, how long he remained at Broken Shaker, whether he paid with cash or a credit card, or where he went after leaving J.G. Mr. Tate could not recall when he supposedly encountered J.G. previously at Shake Shack, testifying only that he "more than likely" had seen or spoken with her while working there.

¶ 37    On redirect examination, Mr. Tate testified that he was approximately six feet two inches tall and again denied assaulting J.G. in any manner.

¶ 38                                          5. Closing

¶ 39    In closing arguments, the State argued that Mr. Tate took a substantial step towards killing J.G. by strangling her and that his doing so, coupled with his threats, demonstrated his intent to kill her. The State also argued that the evidence was extremely strong that Mr. Tate was included in the DNA profile on J.G.'s shirt, noting that the testing revealed that the statistical frequency was one in 86 nonillion. The State continued, "[t]hen we have a DNA profile found on [J.G.'s] oral swab." Defense counsel made a general objection and the Court instructed the jury that "[w]hat the lawyers say is not evidence. You've heard the evidence. If the lawyers make a statement that is not supported by a reasonable inference of the evidence presented at trial, you are to disregard that." The State continued, explaining that "there's a partial DNA profile found on [J.G.'s] oral swab." The defense again objected and the court repeated its instruction to the jury that "what the lawyers say is not evidence." The State continued arguing that the testing revealed that the DNA evidence from the oral swab indicated that it is "at least 17 times more likely that [Mr. Tate] or a male paternal relative is the contributor than a randomly selected individual."

¶ 40    During the defense's closing argument, counsel highlighted inconsistencies in J.G.'s testimony and also argued that the DNA evidence was not reliable. According to defense counsel, "the State has made—they've explained this DNA in a bit of a strange way." Counsel acknowledged that the DNA sample found on J.G.'s shirt was a match with Mr. Tate but insisted that the DNA profile from the oral swab is "not complete and it's not unique. It's not meaningful in an evidentiary way."

¶ 41                          B. Verdict and Posttrial Proceedings

¶ 42    Following closing arguments, the jury deliberated and found Mr. Tate guilty of attempted

first degree murder, aggravated criminal sexual assault based upon oral penetration, and aggravated battery. The jury acquitted Mr. Tate of the count alleging aggravated criminal sexual assault based upon vaginal penetration.

¶ 43    Mr. Tate filed a supplemental motion for judgment notwithstanding the verdict or, alternatively, for a new trial. After hearing argument, the trial court denied the motion.

¶ 44    At sentencing, the court imposed a sentence of 20 years' imprisonment for attempted first degree murder, 30 years' imprisonment for aggravated criminal sexual assault, and 5 years' imprisonment for aggravated battery. The sentences for attempted murder and aggravated criminal sexual assault were to run consecutively, with the aggravated battery sentence to run concurrently, resulting in an aggregate sentence of 50 years in prison. The court denied Mr. Tate's motion to reconsider sentence.

¶ 45    This appeal followed. Mr. Tate was initially represented by the Office of the State Appellate Defender (OSAD). On December 18, 2025, after OSAD filed an opening brief on Mr. Tate's behalf, this court allowed OSAD to withdraw and privately retained counsel to substitute. Mr. Tate's new counsel filed a supplemental brief on February 18, 2026. The State responded to both briefs in its response and no reply brief was filed.

¶ 46                                II. JURISDICTION

¶ 47    Mr. Tate was sentenced on October 23, 2024, and timely filed his notice of appeal on November 1, 2024. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. July 1, 2017), which together govern appeals from final judgments in criminal cases.

¶ 48                                III. ANALYSIS

¶ 49                           A. Attempted First Degree Murder

¶ 50    In the initial brief, filed by OSAD, Mr. Tate argues that the State failed to prove him guilty

beyond a reasonable doubt of attempted first degree murder because "the evidence showed that [he] strangled J.G. to force her to commit sexual acts, but not that he intended to kill her." For the following reasons, we reject this argument.

¶ 51    The State has the burden of proving each element of an offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958 ¶ 35 (citing *Jackson v. Virginia*, 443 U.S. 307, 315-316, (1979), and *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009)). "When the sufficiency of the evidence supporting a criminal conviction is challenged, '[t]he relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Ramos*, 2020 IL App (1st) 170929, ¶ 57 (quoting *People v. Ward*, 215 Ill. 2d 317, 322 (2005)). The reviewing court does not retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. Rather, "[i]t is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts," and we will not substitute our judgment for the factfinder's on those questions. *Id*. We will find the evidence insufficient only where it is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id*.

¶ 52    Mr. Tate was convicted of attempted first degree murder for strangling J.G. with the intent to kill. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016). To sustain this charge, the State had to prove beyond a reasonable doubt that Mr. Tate (1) "performed an act constituting a substantial step toward the commission of murder," and (2) "possessed the criminal intent to kill the victim." *Id.*; *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. Once the elements of attempted murder are completed, abandonment is not a defense. *People v. Myers*, 85 Ill. 2d 281, 290 (1981).

¶ 53    Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded that Mr. Tate had the intent to kill J.G. when he strangled her. J.G. testified that Mr. Tate grabbed her and shoved onto her knees and began to strangle her with both hands

around her neck. He told her "the more you scream, the more you're going to die" and kept one hand on her neck while he forced his penis into her mouth with the other and then resumed strangling her with both hands. He squeezed her neck, punched her on the side of her head twice, and caused her to lose consciousness. J.G. could not breathe or speak and while she did not know exactly how long Mr. Tate choked her, "[i]t felt like forever."

¶ 54    Dr. Jackson, the emergency room treating physician, testified that J.G.'s injuries were consistent with strangulation and testified that strangling a person could make them lose consciousness after a few seconds to a minute, and kill them after only one to several minutes. J.G.'s testimony, the photographic evidence of her injuries, and testimony of Dr. Jackson paint the picture of a brutal attack, one in which a rational trier of fact could conclude that Mr. Tate, at various points, intended to kill J.G.

¶ 55    Mr. Tate points to several cases where this court found that an intent to kill was not established despite evidence of other brutal attacks. Each of these cases is distinguishable in part because they involved a traditional deadly weapon that was not used in a deadly fashion. In *People v. Reynolds*, 2021 IL App (1st) 181227, the defendant beat his girlfriend with the blunt end of a box cutter, accusing her of infidelity, but did not "use it in a deadly fashion" when he had the opportunity, making his conduct "more consistent with an intent to torture or terrorize [her] into confessing that she cheated on him" than an intent to kill. *Id.* ¶ 41. In *People v. Brown*, 2015 IL App (1st) 13187, the defendant stabbed his girlfriend in the back but the injuries were superficial and she testified that she did not even feel pain. *Id.* ¶ 16. In *People v. Thomas*, 127 Ill. App. 2d 444 (1970), the defendant broke into the victim's home wielding a knife and beat, stabbed, and raped her, while repeatedly threatening to kill her. *Id.* at 447. This court  found he did not have an intent to kill, reasoning that, "the opportunity for murder was such that there was insufficient proof that defendant intended or attempted to commit that crime." *Id.* at 456.

¶ 56     The courts in these cases found that, if the defendant had intended to kill the victim, he could have used the deadly weapon in his possession to help him do so. The fact that the weapon was not used in a deadly fashion undermined the State's charge of attempted murder. There was no evidence of a deadly weapon in Mr. Tate's case, which alone distinguishes his case from the ones he relies on.

¶ 57     In addition, there was evidence in this case that Mr. Tate specifically told J.G. "[t]he more you scream, the more you're going to die." Unlike most of the cases Mr. Tate relies on, this express statement supports the State's evidence that the brutal attack was, in fact, an attempted murder.

¶ 58     The State cites *People v. Sotomayor-Quan*, 2021 IL App (1st) 181617-U, which is unpublished, but which we find to provide helpful analysis. In that case, the defendant strangled his girlfriend twice over the course of 30 to 45 minutes, each time almost rendering her unconscious, and repeatedly threatening to kill her. *Id*. ¶ 38. In finding that a rational trier of fact could conclude that defendant had the specific intent to kill and affirming his conviction for attempted murder, we distinguished strangulation from crimes involving weapons like knives or guns. *Id*. ¶ 45. We explained:

> "Choking someone with one's hands is a continuous act with an indeterminate point at which death may occur. Whether the assailant completely blocks the airway or only partially does so, how long the victim can survive without oxygen—it is impossible to be certain when death will result. *** [U]nlike the irreversible decision to shoot someone, for example, intending to kill someone by choking is reversible—one can intend to suffocate someone but then later change one's mind before it's too late." *Id*.

¶ 59     Similarly, in this case, a rational factfinder could easily conclude that Mr. Tate took a substantial step towards committing first degree murder as he was suffocating J.G. and that he had the specific intent to kill her, even if at some point he changed his mind and stopped before she

actually died. Since abandonment is no defense once the elements of the crime are complete, (*People v. Myers*, 85 Ill. 2d 281, 290 (1981)) this evidence is sufficient to sustain Mr. Tate's conviction on this count.

¶ 60      B. Aggravated Criminal Sexual Assault and Aggravated Battery Convictions

¶ 61      In his supplemental brief, Mr. Tate briefly attacks his convictions for aggravated criminal sexual assault and aggravated battery. He does not challenge any specific element of these charges but argues that inconsistencies between J.G.'s account and the medical evidence create reasonable doubt as to all of his convictions. The record does not support this claim.

¶ 62      The jury found J.G.'s testimony credible. Any of the discrepancies between J.G.'s testimony and her previous accounts to medical personnel were fully explored and presented to the jury, who is "free to accept or reject as much or as little of a witness's testimony as it pleases." (Internal quotation marks omitted.) *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67. The minor inconsistencies between J.G.'s accounts here did not "detract from the reasonableness of her story as a whole," as would be necessary for her testimony to be insufficient to support her conviction. *People v. Soler*, 228 Ill. App. 3d 183, 200 (1992).

¶ 63      Mr. Tate also argues that there was no additional evidence corroborating J.G.'s account. No additional evidence was necessary because a single witness's credible testimony is sufficient to sustain a conviction (*People v. Mosley*, 2023 IL App (1st) 200309, ¶ 18), and the State has no extra burden to corroborate a complainant's testimony in a sexual assault case (*People v. Parker*, 2016 IL App (1st) 141597, ¶ 29). We may not substitute our judgment for the jury's on a question of witness credibility. *Gray*, 2017 IL 120958, ¶ 35

¶ 64      However, J.G.'s account was, in fact, corroborated by the medical and DNA evidence. J.G. testified that she was strangled, for example, and Dr. Jackson testified that her injuries were consistent with strangulation. Photographs taken at the hospital show clear markings on J.G.'s

neck. J.G. also testified that she was sexually assaulted and Dr. Jackson testified that his examination was consistent with sexual assault. Mr. Tate's semen was found on J.G.'s shirt and there is a strong probability that additional DNA evidence recovered from her mouth was also a match with Mr. Tate. Her testimony and the corroborating evidence support the jury's finding that the State met the elements of aggravated criminal sexual assault and aggravated battery. See 720 ILCS 5/11-1.30(a)(2), 12-3.05(a)(5) (West 2016) (defining the elements of aggravated criminal sexual assault and aggravated battery).

¶ 65                                    C. Closing Argument

¶ 66    The other contention in Mr. Tate's supplemental brief is that the State "consistently misrepresented the DNA found in [J.G.'s] mouth (over objection from the Defense) as the same completeness as found in the DNA makeup taken from the sleeve of her shirt." Mr. Tate points to the State's closing argument, where he insists that the jury was misled on the reliability of the stipulated DNA evidence.

¶ 67    First, the State argues that Mr. Tate has forfeited this issue because he did not make a specific objection during argument. However, the defense points out that Mr. Tate did object to this argument and the State acknowledges that Mr. Tate made a "general objection."

¶ 68    We need not resolve whether the objection was specific enough to preserve any claim of error since the record does not support Mr. Tate's claim that an error occurred. "A prosecutor has wide latitude in making a closing argument" and "may comment on the evidence and any fair, reasonable inferences it yields [citation], even if such inferences reflect negatively on the defendant." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

¶ 69    In closing arguments, the State referred separately to the stipulated DNA evidence found on J.G.'s shirt and the sample collected from her mouth. The State referred to the oral swab as only "a partial DNA profile," and explained that while the sample from the shirt presented a one in 86

16

nonillion statistical frequency, the oral swab was only 17 times more likely to be a match with Mr. Tate. These two types of DNA evidence were never conflated.

¶ 70    Mr. Tate points to his acquittal on one count of aggravated criminal sexual assault (vaginal penetration) as evidence that the jury did not find J.G.'s testimony "entirely reliable," and insists that because the only other evidence was DNA, the misrepresentation of this evidence warrants a new trial. A trier of fact, however, is entitled to believe all, none, or any part of a witness's testimony. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). And, in our view, the split verdict here indicates that the jurors took proper consideration of both J.G.'s testimony as well as the available corroborating evidence supporting each charge, holding the State to its burden of establishing each charge beyond a reasonable doubt.

¶ 71    Two additional factors weigh against Mr. Tate's claim that the closing argument improperly prejudiced him. First, defense counsel thoroughly responded to and attacked the State's characterization of the DNA evidence in their closing argument, insisting, "[t]hat [the oral swab] DNA profile is not complete and it's not unique. It's not meaningful in an evidentiary way." Additionally, the court twice responded to defense counsel's objections by reminding the jury that "what the lawyers say is not evidence." As our supreme court has explained, "[c]omments in closing argument must be considered in context of the entire closing argument of both the State and the defendant." *People v. Ceja*, 204 Ill. 2d 332, 357 (2003). In addition, instructions to a jury to disregard arguments in closing that are not supported by the evidence are to be considered in assessing the impact of such remarks. *People v. Runge*, 234 Ill. 2d 68, 143 (2009).

¶ 72    In sum, the State did not conflate the two types of DNA evidence in its closing argument and even if that argument was in any way confusing, any effect on the jury was mitigated by the defense counsel's closing argument and the court's instructions.

¶ 73                                  IV. CONCLUSION

¶ 74    For all of the above reasons, we affirm Mr. Tate's convictions for attempted first degree murder, aggravated criminal sexual assault (mouth to penis), and aggravated battery.

¶ 75    Affirmed.